NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190866-U

NO. 4-19-0866

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 20, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | No. 16JA125 |
| v. | ) | |
| Heather B., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Steigmann and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding the trial court did not err in terminating respondent's parental rights.

¶ 2    In September 2016, the State filed a petition for adjudication of neglect or abuse with respect to L.F., the minor child of respondent, Heather B. In January 2017, the trial court adjudicated the minor neglected, made her a ward of the court, and placed custody and guardianship with the Department of Children and Family Services (DCFS). The State filed a motion to terminate respondent's parental rights in June 2019. Following a hearing on the State's motion in October 2019, the court found respondent an "unfit person" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The court then held a best-interests hearing in November 2019, where the court found it was in the minor's best interests to terminate respondent's parental rights.

¶ 3    On appeal, respondent argues the trial court erred in terminating her parental

rights; specifically, she alleges the trial court's unfitness findings and best-interest determination stand against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5         On September 1, 2016, the State filed a petition for adjudication of neglect with respect to L.F.—a minor child born to respondent mother on August 27, 2016—alleging the newborn child and respondent (Heather B.) tested positive for cocaine metabolites. The next day, after a shelter care hearing, pursuant to the stipulation of neglect and immediate and urgent necessity by the parents, the trial court issued an order placing temporary custody and guardianship of L.F. with DCFS.

¶ 6         In October 2016, DCFS established a caregiver service plan for Heather B., setting the following goals: participate in a parenting assessment and follow any recommendations resulting from that assessment; attend and actively participate in any recommended substance abuse treatment; participate in random drug screens as requested by Webster-Cantrell Hall; maintain sobriety throughout the life of this case; consistently attend and appropriately participate in visitation with L.F.; actively and honestly participate in a mental health assessment to determine treatment needs and follow any treatment recommendations.

¶ 7                              A. Adjudicatory Proceedings.

¶ 8         On January 26, 2017, the trial court issued an adjudicatory order, finding: "The minor is abused, neglected as defined by 705 ILCS 405/2-3 in that the minor as a newborn was exposed to illicit drugs as defined by 705 ILCS 405/2-3(1)(c)." The court specifically noted L.F. tested positive for cocaine at birth and Heather B. admitted substance abuse throughout the pregnancy. The court then found the parents (specifically the mother) inflicted the abuse or neglect. The court determined the State proved its allegations of abuse or neglect by a

preponderance of the evidence.

¶ 9 The trial court also issued a dispositional order on January 26, 2017, finding Heather B. unfit, unable, and unwilling to care for, protect, train, educate, supervise, or discipline L.F., and determining placement with her is contrary to L.F.'s health, safety and, best interest because Heather B. admitted using cocaine throughout and after the pregnancy and L.F. tested positive for cocaine at birth. The court granted the State's petition, adjudicated L.F. neglected, and made her a ward of the court. The court ordered DCFS to maintain custody and guardianship over L.F.

¶ 10 B. Termination of Respondent's Parental Rights

¶ 11 On June 25, 2019, the State filed a motion seeking a finding of unfitness and termination of parental rights of Heather B. The State alleged Heather B. was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The State's petition identified six counts as to Heather: (1) Heather B. has failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) Heather B. has failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2018)); (3) Heather B. has failed to make reasonable progress toward the return of the minor to the parent during any nine-month period following adjudication of neglect, specifically the nine-month period between January 26, 2017, and October 26, 2017 (750 ILCS 50/1(D)(m)(ii) (West 2018)); (4) Heather B. has failed to make reasonable progress toward the return of the minor to the parent during any nine-month period following adjudication of neglect, specifically the nine-month period between October 26, 2017, and July 26, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2018)); (5) Heather B. has

failed to make reasonable progress toward the return of the minor to the parent during any nine-month period following adjudication of neglect, specifically the nine-month period between July 26, 2018, and April 26, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)); (6) Heather B. has failed to make reasonable progress toward the return of the minor to the parent during any nine-month period following adjudication of neglect, specifically the nine-month period between September 21, 2018, and June 21, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 12        The State further contended termination of Heather B.'s parental rights was in L.F.'s best interests and asked for custody and guardianship to remain with DCFS; giving it the authority to consent to L.F.'s adoption.

¶ 13        In October 2019, the trial court held a fitness hearing. Heather B. attended the hearing, represented by counsel. Matthew Stymets, a foster care caseworker with Webster-Cantrell Hall, testified for the State. Stymets testified he had been L.F.'s caseworker since February 2019 and he was familiar with her case. Stymets testified concerning Heather B.'s progress toward her service plan goals for the period from October 2016 through October 2017. Stymets explained that during this first year Heather B. completed just eight drug tests with six negative results, one positive for cocaine and opiates, and one unreported result. Heather B. failed to appear for drug testing 73 times. Likewise, Stymets described Heather B.'s visitations with L.F. as "very hit or miss." He stated Heather B. began this time period with a standard visitation schedule, twice weekly supervised visits. But because Heather B. "frequently miss[ed] visits" with L.F., Webster-Cantrell Hall reduced her visits to once weekly in March 2017. The agency also required Heather B. to call 24 hours ahead to confirm each visit. Overall, Stymets rated Heather B.'s progress during this one-year period "unsatisfactory" based on her failure to complete parenting classes, her failure to continue outpatient mental health treatment following

inpatient treatment at Heritage, her inconsistent drug drops, and her inconsistent visits with L.F.

¶ 14　　　　　For the period of October 2017 to April 2018, Stymets testified Heather B. took some steps in her service plan. She completed parenting classes in January 2018. She underwent a new mental health assessment and a substance abuse assessment in February 2018 and no further services were recommended. Also, Heather B. "rarely missed visits" with L.F. during this timeframe. Stymets noted, however, that Heather B. was still inconsistent with drug testing. She completed 40 tests, with 2 tests positive for methamphetamine or alcohol, 2 adulterated tests, and 36 negative results. Heather B. failed to appear for drug testing 11 times during this timeframe.

¶ 15　　　　　Stymets testified that from April 2018 through October 2018 Heather B. participated in consistent visitation, but some visits did not go well due to Heather's behavior. Stymets stated Heather argued with case aides and caseworkers, describing her as "verbally combative." Stymets testified Heather B. remained inconsistent with drug testing. She completed 15 drug tests, with 13 clean tests, 1 test unknown due to equipment failure, and 1 adulterated test. She failed to appear for testing 27 times. Stymets rated Heather B.'s overall progress during this period "unsatisfactory."

¶ 16　　　　　Concerning the time period of October 2018 to April 2019, Stymets testified Heather B.'s services did not change. He confirmed Heather B. remained consistent with visitation. Stymets testified Heather B. began having unsupervised weekend visits with L.F. in January, but Webster-Cantrell Hall discontinued those visits after L.F. returned home with an unexplained large red mark on her nose. When questioned about the red mark, Heather would not give the agency "a straight answer on what it was or what had been done." Stymets testified Heather B. was more compliant with drug testing during this timeframe. She completed 22 tests with 2 positive tests, 2 adulterated tests, and 18 negative tests. Heather B. failed to appear for

drug testing 13 times.

¶ 17          Stymets testified Heather B. regressed during the period of April 2019 to June 2019. She was criminally charged with one count of domestic violence and she was evicted from her apartment. Heather B. maintained consistent visitation with L.F., but Stymets did not rate those visits successful because of Heather's behavior. Stymets reported Heather B. constantly argued with agency staff, yelled obscenities in front of children, and disrupted others' visits at the agency. When asked if Heather B. could meet minimal parenting standards within the next three to six months, Stymets testified she could not. When asked if she could meet minimum standards in nine months, Stymets answered no.

¶ 18          On cross-examination, Stymets acknowledged Heather B.'s progress, namely her substance abuse treatment and subsequent assessment in February 2018. He also noted her negative drug screens and compliance with services. Stymets also acknowledged Heather B. maintained stable housing until her eviction in April 2019 and she consistently visited her child.

¶ 19          Stymets was the only witness at the fitness hearing. After admitting one exhibit (drug testing results), the State rested. Neither Heather B. nor the guardian *ad litem* (GAL) presented any evidence.

¶ 20          In its closing statement, the State argued Heather B. met the definition of an "unfit person" because she failed to maintain a reasonable degree of interest, concern, or responsibility for L.F., she failed to make reasonable efforts to correct the conditions that provided the basis for removing L.F. from her custody, and she failed to make reasonable progress toward the return of L.F. to her during any nine-month period following the adjudication of neglect. The State noted Heather B. inexplicably delayed beginning services, and, once she did, she was inconsistent in completing services. The State highlighted Heather B.'s inconsistent drug tests, inconsistent

visitation, and angry confrontations with caseworkers. The State argued that after three years, L.F. needed permanency.

¶ 21　　In arguing against Heather B.'s unfitness, her counsel pointed the court's attention to the service goals Heather B. satisfied, namely, her clean drug tests and substance abuse treatment. Counsel noted these accomplishments showed Heather B. made reasonable efforts at correcting the conditions (her drug use) that provided the basis for removing L.F. from her care. Counsel acknowledged Heather B. struggled during the first year of services, but she regrouped and made sufficient progress by completing most of her services. Counsel admitted Heather B.'s faults but argued those faults did not make her an unfit person: "She's difficult. She has an anger problem. I don't necessarily think that makes her a bad mother or someone who should lose her ability to be a parent to this child."

¶ 22　　The GAL argued the State proved all six unfitness allegations by clear and convincing evidence. The GAL noted Heather B. did not take positive steps toward completing her service plan during the first nine-month period following the neglect adjudication. The GAL pointed to Heather B.'s failure to submit to drug testing consistently as proof she did not make reasonable progress. Likewise, the GAL highlighted Heather B.'s inconsistent visitation with L.F. as an indicator she failed to make reasonable efforts or progress toward having L.F. return to her home.

¶ 23　　The trial court rendered its decision on the record, expressly stating: "[F]or the period of 2016, the onset of the case, through June of 2019, the mother never *** had a service plan that was rated overall satisfactory." The court noted Heather B. "did start some services" and "did show some progress at certain times, but that progress was slow." Specifically, the court discussed Heather B.'s argumentative and disruptive behaviors during supervised visits with L.F.

- 7 -

at Webster-Cantrell Hall. The court restated Mr. Stymets's view that if Heather B. "was to begin her services in earnest immediately" she would not be able to "safely parent this child [or] meet minimal parenting standards within three to six months." The court found Mr. Stymets's testimony credible and ultimately concluded the State proved by clear and convincing evidence that Heather B. was an "unfit person" pursuant to the six statutory counts alleged in the petition.

¶ 24                                    C. Best-Interests Hearing

¶ 25        The trial court held the best-interests hearing in November 2019. The State again called caseworker Matthew Stymets as its lone witness. Stymets testified he prepared a best-interests report for the hearing. He testified L.F. had been in a potentially adoptive placement with her maternal grandmother since 2016. Stymets explained L.F. was doing remarkably well in that placement. He testified L.F. and her grandmother enjoyed "an excellent relationship" where L.F. considered her grandmother to be her mom. Stymets stated the grandmother provided for L.F.'s physical safety, health, and welfare. By contrast, Stymets opined Heather B. could not provide a safe environment for L.F., citing her drug use, unstable housing since her eviction, and recent domestic violence charge. Stymets also stated Heather B. would have a hard time getting L.F. to preschool because she did not have a driver's license and struggled sticking to a routine. Ultimately, Stymets believed that removing L.F. from placement with her grandmother would traumatize her. Stymets testified that it is "in [L.F.'s] best interest for her to be adopted by her grandmother."

¶ 26        The State asked the trial court to consider the best-interests report. With that, the State rested. Neither Heather B. nor the GAL presented evidence at this hearing.

¶ 27        After the arguments of counsel, the trial court indicated it had considered the statutory best-interest factors, labeling the most relevant and applicable factors as—"the child's

sense of attachment, her sense of security, familiarity, continuity, the least disruptive placement alternative for this child, and perhaps most important of all, this child's need for permanence, including her need for stability and continuity of relationships with parent figures." The court then reviewed Mr. Stymets's written best-interests report and oral testimony, highlighting the following facts: L.F. was well-bonded to her grandmother, L.F. developed a life for herself with her grandmother, the two have a strong attachment, L.F. is doing remarkably well in preschool, L.F. is happy, L.F.'s grandmother provides for her health, safety, and welfare, and L.F. would be traumatized if removed from her grandmother. The court concluded the State proved by a preponderance of the evidence that it is in L.F.'s best interest that Heather B.'s parental rights be terminated.

¶ 28        The trial court's written judgment outlined its findings from the fitness and best-interest hearings. Specifically, the court's order found: (1) the State had proven by clear and convincing evidence that Heather B. was an unfit person within the meaning of section 1(D) of Illinois's Adoption Act (750 ILCS 50/1(D) (West 2018)) and (2) it was in the best interests of the minor, L.F., and the public that Heather B. have her residual parental rights and responsibilities terminated as to L.F., and L.F. was relieved of all obligations of obedience and maintenance with respect to Heather B.

¶ 29        This appeal followed.

¶ 30                                II. ANALYSIS

¶ 31        Respondent argues the trial court erroneously terminated her parental rights because the court's unfitness and best-interest determinations go against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 32        The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1 *et seq.*

(West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person" and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998)). Here, Heather B. challenges the trial court's determinations at each of these steps. We take her challenges in turn.

¶ 33                                  A. Unfitness Finding

¶ 34        "The State must prove parental unfitness by clear and convincing evidence." *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011). The Adoption Act provides several grounds on which a trial court may find a parent "unfit," including: the parent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2018)); the parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any nine-month period following the adjudication of neglect or abuse or dependency under the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2018)); or the parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2018)). Despite several potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83, 19 N.E.3d 227. See also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006) ("A finding of unfitness will stand if supported

- 10 -

by any one of the statutory grounds set forth in section 1(D) of the Adoption Act.") (citing *In re D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001)).

¶ 35    This court pays "great deference" to a trial court's fitness finding because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." *A.L.*, 409 Ill. App. 3d at 500. We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since "[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts" (*In re Jacorey*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91), we now turn our attention to the facts of this case.

¶ 36    The State alleged Heather B. was unfit based on several statutory grounds. Four of the six counts cited Heather's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State identified four different nine-month periods: January 26, 2017, to October 26, 2017; October 26, 2017, to July 26, 2018; July 26, 2018, to April 26, 2019; and September 21, 2018, to June 21, 2019. The trial court found that Heather B. failed to make reasonable progress during any of those four nine-month periods, and she now challenges those findings as against the manifest weight of the evidence.

¶ 37    During the first nine-month period (January 26, 2017, through October 26, 2017) Heather B. made no progress whatsoever. Despite receiving referrals for a substance abuse assessment and parenting classes, Heather B. did not engage in those services. Likewise, she did not follow-up with recommended outpatient mental health treatment. During these nine months, Heather B. completed two drug tests—with one test clean and the other result unreported. She failed to appear for drug testing 52 times. Finally, Heather B.'s visitation with L.F. during this

- 11 -

timeframe was "very hit or miss." Because she frequently missed visits, the agency decreased her supervised visits from twice weekly to once weekly.

¶ 38        No doubt to distract us from these early failures, Heather B. points to evidence showing her later accomplishments in treatment as proof she made reasonable progress during the nine-month periods between October 26, 2017, and July 26, 2018; July 26, 2018, and April 22, 2019; or September 21, 2018, and June 21, 2019. Indeed, the record shows Heather B. took steps toward completing her services in 2018. She completed her parenting assessment and parenting classes in January, and she completed a substance abuse assessment in February. Heather B. consistently participated in drug screens between January 2018 and April 2018, and then between August 2018 and September 2018. But Heather's successes often met setbacks. She had stretches of time where she did not submit to drug testing consistently. From May 2018 through July 2018, she had 5 clean tests, but she failed to appear for testing 22 times. Then from October through December 2018, she had 4 clean tests but failed to appear for drug testing 11 times. Throughout 2018 and 2019, Heather B. participated in visitation with L.F., but her confrontational and combative behavior with staff made those visits unsuccessful. She yelled at agency staff, often using obscenities in front of children.

¶ 39        We cannot say Heather B. demonstrated reasonable progress during any nine-month period the State identified. As we have previously explained, "reasonable progress is an objective standard," measuring whether "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *F.P.*, 2014 IL 140360, ¶ 88. Since Heather B. completed no services from January to October 2017, the court could not have returned L.F. to her custody during that time,

let alone in the near future. Furthermore, Heather B.'s sporadic compliance with services in 2018 and 2019 was not of sufficient demonstrable quality to have allowed the court to return L.F. to her custody in the near future because she could never sustain progress. Indeed, evaluators routinely noted Heather B. was not making reasonable progress toward L.F. returning home. See *In re K.H.*, 346 Ill. App. 3d 443, 455, 804 N.E.2d 1108, 1118 (2004) (explaining that section 1(D)(m)(ii) of the Adoption Act "mandates that parents must, with some degree of consistency, make reasonable progress toward their children's return home or risk forfeiting their parental rights").

¶ 40    Taken together, all the evidence relating to Heather B. reveals she failed to make demonstrable, quality progress for any nine-month period of time since January 2017. The State, therefore, proved Heather B. an unfit person by clear and convincing evidence. And since the evidence does not point to the opposite result, the trial court's unfitness finding that Heather B. failed to make reasonable progress toward L.F.'s return home during any nine-month period following the adjudication of neglect does not go against the manifest weight of the evidence.

¶ 41    Because we can affirm the trial court's unfitness finding on this basis, we need not consider the other statutory grounds on which the trial court found Heather B. unfit. *A.L.*, 409 Ill. App. 3d at 501 (citing *In re Katrina R.*, 364 Ill. App. 3d 834, 842, 847 N.E.2d 586, 593 (2006)) ("On review, if there is sufficient evidence to satisfy any one statutory ground, we need not consider other findings of parental unfitness.").

¶ 42                    B. Best-Interests Determination

¶ 43    Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's

- 13 -

interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of
> the child's identity; (3) the child's familial, cultural[,] and religious
> background and ties; (4) the child's sense of attachments, including
> love, security, familiarity, continuity of affection, and the least
> disruptive placement alternative; (5) the child's wishes and long-
> term goals; (6) the child's community ties; (7) the child's need for
> permanence, including the need for stability and continuity of
> relationships with parent figures and siblings; (8) the uniqueness of
> every family and child; (9) the risks related to substitute care; and
> (10) the preferences of the person available to care for the child."
> *Daphnie E.*, 368 Ill. App. 3d at 1072. See also 705 ILCS
> 405/1-3(4.05) (West 2018).

¶ 44        A trial court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is

clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 45 Heather B. contends the trial court's determination that terminating her parental rights goes against the manifest weight of the evidence because "it would be in the best interests of the child to grow up with Heather who loves her and has fought for her." She cites no evidence for this conclusion, though. The State, on the other hand, presented copious evidence showing that terminating Heather B.'s parental rights serves the best interests of L.F. Through testimony and a written report from Mr. Stymets, the State presented the court with the following evidence of L.F.'s best interests: L.F. is well-bonded to her grandmother, the two have an excellent relationship, L.F. developed a life with her grandmother and calls her "mom," L.F. is doing remarkably well in preschool, L.F.'s grandmother takes care of her, and the two share a strong sense of love and attachment. The State's evidence shows L.F. is indeed growing up with someone who loves her and fights for her—her maternal grandmother.

¶ 46 After reviewing the above evidence, the trial court opined that two statutory factors weighed heavily in its best-interest determination: first, the child's sense of attachment, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; and, second, the child's need for permanence, including the need for stability. See 705 ILCS 405/1-3(4.05) (West 2018). The court concluded that since L.F. enjoyed a loving relationship with her grandmother and the two were strongly attached, terminating Heather B.'s parental rights served L.F.'s best interest. Likewise, because L.F. needed permanence and stability that Heather B. could not give her, the court determined that terminating Heather B's parental rights served L.F.'s best interests. Since the evidence does not lead us clearly to opposite conclusions, we cannot say the trial court's best-interests determination goes against the manifest

weight of the evidence.

¶ 47                            III. CONCLUSION

¶ 48          For the reasons stated, we affirm the trial court's judgment.

¶ 49          Affirmed.