NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210026-U

NOS. 4-21-0026, 4-21-0027, 4-21-0028 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 9, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* R.M., P.M., and E.P., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 18JA1 |
| v. | ) | 18JA2 |
| Jason M., | ) | 19JA95 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, holding the trial court's finding of unfitness and its
termination of respondent's parental rights were not against the manifest weight
of the evidence.

¶ 2        In January 2018, the State filed petitions for adjudication of neglect with respect

to R.M. and P.M. In May 2019, a petition for adjudication of neglect was filed regarding

one-month-old E.P. All three were minor children of respondent, Jason M. The petitions alleged

the children were neglected and living in an environment injurious to their welfare. In May 2018,

the trial court adjudicated R.M. and P.M. neglected, made them wards of the court, and placed

custody and guardianship with the Department of Children and Family Services (DCFS). The

court made the same finding for E.P. in October 2019. The State filed a petition to terminate

respondent's parental rights to R.M. and P.M. in May 2020. Approximately four months later,

the State filed the same petition for E.P. Respondent mother did not participate in the fitness or best-interests hearing and is not involved in this appeal. Following hearings on the State's petitions in December 2020, the court found respondent unfit and determined it was in the minors' best interests to terminate respondent's parental rights.

¶ 3        In February 2021, we granted Jason M.'s motion to consolidate the three cases for appeal. On appeal, Jason M. challenges the trial court's decision to terminate his parental rights, arguing the unfitness and best-interests determinations stand against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On January 2, 2018, the State filed a petition alleging R.M. (born October 17, 2017) and P.M. (born November 26, 2014) were neglected. A petition for E.P. (born April 23, 2019) was filed shortly after her birth. All three are minor children of Jason M. The petitions alleged the children were neglected under section 2-3(1) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1) (West 2018)), specifically that (1) R.M., as a newborn, was found to have cocaine in her system at birth and her environment was injurious to her welfare based on Jason M. and respondent mother's drug use; (2) P.M. was alleged to be neglected due to an injurious environment based on Jason M. and respondent mother's drug use; and (3) in the petition filed later on behalf of E.P., she was alleged to be neglected due to an injurious environment based on her siblings' earlier adjudications and her mother's failure to make reasonable progress toward the return of the siblings. After a shelter care hearing, the trial court issued an order placing temporary custody and guardianship of the children with DCFS.

¶ 6        In April 2018, based upon a stipulation by the parties, the trial court found R.M. and P.M. neglected. At the May 2018 dispositional hearing, the court adjudicated P.M. and R.M.

wards of the court and placed custody and guardianship with DCFS. Paternity testing established Jason M. as E.P.'s father in July 2019. In September 2019, the court adjudicated E.P. neglected, and at the dispositional hearing, the court found it was in E.P.'s best interests to make her a ward of the court and place custody with DCFS, citing respondent mother's unaddressed substance abuse issues and Jason M.'s unaddressed anger issues.

¶ 7     In March 2020, the State filed a petition to terminate Jason M.'s parental rights to R.M. and P.M. The State's petition alleged he was unfit based on his failure to make reasonable efforts to correct the conditions causing removal of the children and failure to make reasonable progress toward the return of the children pursuant to sections 1(D)(m)(i) and (ii) of the Illinois Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)) for two nine-month periods between April 26, 2018, to January 26, 2019, and January 26, 2019, to October 26, 2019. Regarding E.P., the State's termination petition alleged the same lack of efforts and progress between the dates of September 19, 2019, to June 19, 2020. In all petitions, the State asked to terminate Jason M.'s parental rights and alleged it was in the minors' best interests that custody and guardianship remain with DCFS with the authority to consent to adoption. All three petitions to terminate Jason M.'s parental rights were heard in December 2020.

¶ 8                              A. Fitness Hearing

¶ 9     The State's first witness, Danielle Croll, was a caseworker for Lutheran Child and Family Services. Both before and during her testimony, Jason M. engaged in several outbursts claiming he was "not getting a fair trial," expressing his displeasure for the proceedings, or commenting on testimony as it was being given. After being admonished by the trial court on several occasions about his constant interruptions, Jason M. exclaimed he was not receiving a fair trial and left the courtroom, not returning until the next day of the fitness proceedings.

¶ 10 Croll outlined the services contained in Jason M.'s service plans and his obligation to cooperate with substance abuse treatment and drug testing. She testified to providing him with a copy of each service plan and reviewing it with him. She said from June 2018 to December 2018, Jason was required to complete 11 drug tests but he only completed 4 drug tests. Of the four he completed, he tested positive for marijuana each time. He had been recommended for outpatient substance abuse treatment, but when he failed to complete it, he was unsuccessfully discharged from the program in September 2018. She further testified that from December 2018 to June 2019, Jason M. completed domestic violence and anger management classes but he failed to engage in substance abuse treatment or recommended counseling. Jason was still rated "unsatisfactory overall" regarding his anger management issues due to his disrespect and angry outbursts toward staff, which concerned the agency as posing a potential danger to the children.

¶ 11 Croll said the agency's concerns about Jason M.'s substance abuse issues stemmed not only from the positive marijuana drug tests but also because he admitted to previously using cocaine before one of the children came into DCFS's care. The agency believed, or at least could not rule out, Jason M. was still using cocaine due to his frequent drug drop absences. From June 2019 to June 2020, he was asked to provide a total of 13 drops, but he only provided 3 drops, 2 of which were positive for marijuana and 1 returned as "adulterated." She explained DCFS contacted Jason M.'s attorney to coordinate dates and times for his drug testing in order to avoid interfering with his work schedule but he failed to attend those as well.

¶ 12 She testified Jason M. interacted with the children appropriately when he attended visits with them but, from 2019 until the date of the fitness hearing, he missed a total of 16 visits. Since 2019, DCFS sought to increase his visitation hours with the children but required him to

first complete three consecutive negative drug drops. He has never done so, despite being informed about the importance of successfully completing these drug drops in order to have his children returned to him. At the conclusion of the first day of evidence, the trial court took judicial notice of the children's adjudication orders and dispositional orders without objection.

¶ 13    The following day, Jason M. appeared and was called by his attorney to testify. He claimed before Christmas in 2018, P.M. and R.M. were returned to his care due to his successful completion of three consecutive drug tests but, after respondent mother tested positive, the children were removed again. He said he thought there were only three services he needed to complete to have the children returned to his care: a substance abuse assessment, parenting classes, and domestic violence classes. He stated he completed all of these services more than two years ago and was unaware he was required to engage in individual counseling. He blamed DCFS and caseworker Croll for mistreating him, insinuating she was setting him up for failure by mailing "court paperwork" to an address where she knew he did not reside and falsifying his cocaine use admission. Jason M. did admit missing several drug drops because he lost employment and housing and said, "three years of drug drops for only marijuana should have been enough." He stated he was "not going to take a chance of losing another job and another house just to appease [DCFS]." Regarding his marijuana use, he admitted smoking marijuana without a medical marijuana card before it was legalized and, although he smokes marijuana when he is stressed, he would never use marijuana when alone with his children.

¶ 14    After testimony from Jason M.'s mother and his oldest adult son, the trial court continued the hearing to January 2021. At the next hearing, Jason M.'s counsel called Beth Evans-Berning, the supervisor of caseworker Croll at Lutheran Child and Family Services. She confirmed Jason was required to successfully complete three consecutive drug drops before

increasing visitation time, and Jason's failure to consistently comply with drug screening made her believe he was possibly using other controlled substances. Her concern about Jason M.'s drug use came from a "screenshot" of a text message displaying what she believed was Jason's request to buy or trade drugs and also his "lack of regular attendance at drug drops and erratic behavior." Jason contended he was texting respondent mother's sister in an attempt to purchase a "half ounce of marijuana."

¶ 15        The trial court found the State proved by clear and convincing evidence Jason M. did not make reasonable efforts or progress within the nine-month time periods and found him unfit. After the finding, Jason M. yelled multiple expletives at the trial court and left the courtroom. The trial court confirmed Jason M.'s counsel's unsuccessful efforts to speak with him outside the courtroom and learned he had, in fact, left the courthouse. The trial court continued with the best-interests portion of the proceeding in Jason M.'s absence.

¶ 16                        B. Best-Interests Determination

¶ 17        At the best-interests hearing, the State recalled Danielle Croll. She reported all three girls currently live with their foster mother, Katherine Young; P.M. and R.M. have been there since December of 2018, and E.P. has been living with her since shortly after her birth. The foster mother attends to all of their medical, emotional, and educational needs, and the girls have been making continuous progress since their placement. She stated all the children have a strong bond with the foster mother, are very established in her household, and the foster mother has acknowledged her desire to adopt the children.

¶ 18        Jason M.'s counsel presented no other evidence. After hearing the arguments of counsel, the trial court reviewed "all of the best interest factors as set forth in the statute" and found it was in the best interests of the children to terminate Jason M.'s parental rights. The court

noted the children had been in care for a significant period of time and the foster placement was "pretty much the only home [E.P.] has really known." The court pointed out that Jason M. failed to complete the required services to satisfy DCFS's concerns regarding his drug use. The court observed, "I have no reason to believe that if given more time that there would be anything different." The court further commented on how the foster mother was the person who had provided stability for the children for most of their lives, was considered "mom" by them, and was the best placement to provide permanency. The court found termination of Jason M.'s parental rights was in the best interests of the children, ordered guardianship to continue with DCFS, and ordered the permanency goal to be changed to adoption.

¶ 19        This appeal followed.

¶ 20                            II. ANALYSIS

¶ 21        Jason M. challenges the trial court's decision to terminate his parental rights, arguing the unfitness and best-interests determinations stand against the manifest weight of the evidence. We disagree and affirm.

¶ 22        The Juvenile Court Act (705 ILCS 405/1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))). Here, Jason M. challenges the trial court's determinations at each of these steps. We take his challenges in turn.

¶ 23                                          A. Fitness Hearing

¶ 24            " 'The State must prove parental unfitness by clear and convincing evidence ***.' " *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004)). The Adoption Act provides several grounds on which a court may find a parent "unfit." One is a parent's failure to make *reasonable efforts* to correct the conditions that were the basis for the removal of the minor during any nine-month period following the adjudication of neglect, abuse, or dependency under the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2018)). "The question of what is a reasonable effort involves a subjective judgment based upon the amount of effort that is reasonable for a particular person[.]" *In re A.P.*, 277 Ill. App. 3d 592, 598, 660 N.E.2d 1006, 1011 (1996). Another basis for a finding of unfitness involves a parent's failure to make *reasonable progress* toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2018)). Reasonable progress includes a parent's compliance with service plans and court directives, "in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001). "We have held that 'reasonable progress' is an 'objective standard' and that a parent has made reasonable progress when 'the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original). *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991)). Despite multiple bases for unfitness, "one statutory

ground [is] enough to support a [court's] finding that someone [is] an 'unfit person.' " *F.P.*, 2014 IL App (4th) 140360, ¶ 83; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." (citing *In re D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001))).

¶ 25　　　　　This court pays great deference to a trial court's fitness finding because of that court's "superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *A.L.*, 409 Ill. App. 3d at 500. We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. "Each case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts ***." (Internal quotation marks omitted.) *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91.

¶ 26　　　　　The evidence at the fitness proceeding revealed that from April 2018 to June 2020, Jason M. was ordered to successfully complete services for substance abuse treatment, domestic violence classes, and parenting classes and to comply with toxicology screenings. Although he completed a substance abuse assessment in July 2018 and was assigned a counselor for outpatient services, Jason M. was discharged as unsuccessful for noncompliance two months later. Additionally, he failed to comply with the majority of DCFS's requests for drug screens. During the first nine-month period concerning R.M. and P.M. (April 26, 2018, to January 26, 2019), he attended 4 of 11 scheduled drug screens. The four screens he did attend all tested positive for marijuana. From June 2019 to June 2020, encompassing the second nine-month period for R.M. and P.M. (January 26, 2019, to October 26, 2019) and the nine-month period

alleged for E.P. (September 19, 2019, to June 19, 2020), he attended 3 of 12 scheduled drug screens. Two of those resulted in positive tests for marijuana, and the third result was reported as "adulterated." In total, Jason M. appeared for 7 of 23 scheduled drug drops, and not a single test was clean.

¶ 27 His lack of effort to comply with drug screens was significant in light of DCFS's legitimate concerns about Jason's drug use as a result of his admitted cocaine use, as well as his consistent use of marijuana. Jason M. was repeatedly told he was required to provide three consecutive negative drug screens in order to obtain increased visitation, and he refused to do so. Not only did he fail to accomplish this over the course of the several years this case was pending, he often displayed a cavalier and defiant attitude toward this requirement and DCFS in general. He downplayed his marijuana use and appeared to view the drug screens as a hinderance as opposed to an opportunity to obtain more time with his children.

¶ 28 Jason did successfully complete domestic violence and anger management classes; however, evidence of any assimilation of the lessons was lacking. He was unable to control his temper during the course of the proceedings and throughout the duration of the cases. His continuous and repeated interruptions of the trial court and witnesses was exceeded only by his tantrum-like behavior in storming out of the courtroom and eventually leaving the proceedings entirely. DCFS rated his anger management "unsatisfactory overall" due to his outbursts and rude behavior toward staff. He was considered to pose a danger to the children due to his "lack of patience." The court appropriately noted his inability to restrain himself in the court setting and how "successful completion" of anger management classes appeared to reap no positive results.

¶ 29 Based on this record, it was not against the manifest weight of the evidence for the trial court to conclude Jason M. failed to make reasonable efforts or progress during the nine-month time frames alleged in the termination petitions because of his failure to comply with services and DCFS directives. See *C.N.*, 196 Ill. 2d at 216-17 (stating reasonable progress includes a parent's compliance with service plans and court directives in light of the condition which gave rise to the removal of the child). Consequently, we owe the court the deference it deserves. See *A.L.*, 409 Ill. App. 3d at 500 (stating a reviewing court affords great deference to a trial court's fitness findings and will not reverse the court's decision unless it was contrary to the manifest weight of the evidence); *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616 (stating a decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent, or if it is unreasonable, arbitrary, or not based on the evidence).

¶ 30                                    B. Best-Interests Hearing

¶ 31 Once a parent is found "unfit," the trial court must next decide whether terminating parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018).

¶ 32        A trial court's finding that termination of parental rights is in a child's best interests, just as its the fitness finding, will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185.

¶ 33        At the best-interests hearing, the trial court heard how the minors had resided in their current placement for most of their lives and the foster mother attended to all of their needs, had a strong bond with all of the children, and intended to adopt them. Although Jason M. shared a bond with the children and acted appropriately with them at visits, he repeatedly missed visits and failed even the simple task of three consecutive clean drug drops to secure additional visitation time. Throughout the almost three years the cases have been pending, Jason M. failed to address the issues that caused the children to come into care. When weighed against a legitimate concern for permanency for children of tender years, the court's finding that termination was in their best interests is not against the manifest weight of the evidence.

¶ 34        The trial court properly considered the statutory best-interests factors, noting P.M. had spent half her life in foster placement, R.M. had been in placement since she was one, and it was "pretty much the only home [E.P.] has ever known." The court found their current placement provided the greatest chance for permanency, observing, "[foster mom] has been the one who has been there for them, at least for the two children, most of their lives. The children are attached to her. They call her mom. That's where their needs currently are being met." Jason M. argues the bond and attachment he shares with the children is evidence the trial court's best-interests determination was erroneous. However, the court acknowledged that same bond but weighed it against his poor performance and lack of successful completion of services over an extended period of time. The court properly concluded, "I have no reason to believe that if given more time that there would be anything different." The focus was now properly on the best

interests of the children and not the desires of the parent. See *Daphnie E.*, 368 Ill. App. 3d at 1071-72; 705 ILCS 405/1-3(4.05)(a) to (j) (West 2018).

¶ 35 The record shows these children feel loved, valued, secure, and nurtured in their current placement and have structure and continuity, and it supports the trial court's decision terminating Jason M.'s rights served the children's best interests. The decision is neither unreasonable nor arbitrary. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Additionally, we cannot say the trial court's best-interests determination is against the manifest weight of the evidence. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 36 III. CONCLUSION

¶ 37 For the reasons stated, we affirm the trial court's judgment.

¶ 38 Affirmed.